UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 9:07-CV-80680-RYSKAMP/VITUNAC

INFINITY GLOBAL LLC, a
Delaware limited liability company,

    Plaintiff,

vs.

RESORT AT SINGER ISLAND
PROPERTIES, INC., a Florida corporation,
and
WCI COMMUNITIES, INC.,
a Delaware corporation,

    Defendants.
_____/

**DEFENDANT WCI COMMUNITY INC.'S
MOTION TO DISMISS THE COMPLAINT AND
INCORPORATED MEMORANDUM OF LAW**

    Defendant WCI Communities, Inc. ("WCI"), pursuant to Fed.R.Civ.P. 12(b)(6) and S.D. Fla. L.R. 7.1, moves the Court to dismiss Plaintiff's Complaint as to WCI with prejudice. The grounds for this motion are stated with more particularity in the following Memorandum of Law.

**MEMORANDUM OF LAW**

Introduction

    On September 30, 2004, Plaintiff agreed to speculatively invest in two luxury condominium units from Resort, which are the subject of this lawsuit. Plaintiff, a sophisticated real estate investment LLC entered into two contracts outlining in detail the nature of the property being sold and the terms of the purchase. By signing these contracts, Plaintiff acknowledged that Resort would be damaged by its failure to close, and expressly agreed to forfeit its deposit, with interest, to pay for this damage. Plaintiff has refused to close on the

condominium purchase. It therefore forfeited the deposit to Resort, as agreed. Nonetheless, on July 31, 2007, Plaintiff filed this action seeking to avoid the legal effect of the contracts it willingly signed. Although the complaint contains class allegations, Plaintiff has not complied with the rules concerning class actions; therefore, this action cannot be considered a putative class action.

I.   ALLEGATIONS IN THE COMPLAINT

Almost three years have passed since Plaintiff, a real estate speculation LLC, agreed to purchase two multi-million dollar condominiums from Resort. After refusing to close on the purchases due to the downturn in the Florida condominium market and realizing that it would be required to pay its deposits as damages for this breach of contracts, Plaintiff now alleges that it was somehow misled at the time it entered into the contracts.

Plaintiff alleges that Resort, acting as an "agent or alter ego of WCI," violated the Interstate Land Sales Full Disclosure Act, 15 U.S.C. § 1701 *et seq.*, by committing various misleading and deceptive acts during the condominium sales transaction three years ago. Compl. ¶¶ 21-69. Plaintiff thereby seeks to hold WCI liable for the acts of its subsidiary, Resort. WCI was not a party to Plaintiff's condominium purchase contracts, and Plaintiff does not allege that he had any contact with WCI in the course of his transaction.

Specifically, Plaintiff alleges that "Resort/WCI" violated ILSA by by 1) charging interest during a "cure" period after the purchaser breaches the sales contract by failing to close; 2) stating in the contract that an affiliated title insurance company charges the "minimum rate promulgated by the Florida Department of Insurance"; 3) requiring a purchaser to sign a release in connection with the refund of the purchaser's deposit; 4) providing Plaintiff with an updated estimated assessment budget showing that Plaintiff would be charged the same total assessments

as reflected in the original estimated assessment budget; 5) delivering one page of a fifty-four page property report to Plaintiff one week after the fifty-three pages had been given to it; and 6) enforcing the liquidated damages provision of the contract. Compl. ¶¶ 21-69.

Plaintiff also alleges that the exact same conduct, all of which occurred in the context of Plaintiff's transaction with Resort, violated the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"). Compl. ¶¶ 70-99. Plaintiff inexplicably asserts this FDUTPA claim only against WCI, which had no actual involvement in Plaintiff's transaction. *Id.* at ¶ 81.

Interestingly, Plaintiff does not allege that it was charged or actually paid any interest at all for the period after it breached the contract by refusing to close. Plaintiff does not, and cannot, allege that it actually purchased any title insurance with respect to the contracts at issue in this case, since it did not close on the purchase of those condominiums. Nor does Plaintiff allege that it, or anything else, was actually charged a greater amount for assessments than the assessments listed in the estimated budget.

There are also no allegations in the Complaint explaining why Plaintiff only now asserts that these terms in the contracts—which were in the contracts at the time it signed them three years ago—were "misleading." Plaintiff had ample opportunity to read the contracts, understand its terms, and object or rescind the contracts. Plaintiff did not do so and cannot now seek to avoid its obligations under the contracts simply because there has been a downturn in the Florida condominium market and it does not want to forfeit its deposit as it agreed in the contracts.

## II.   STANDARD ON MOTION TO DISMISS

The United States Supreme Court recently clarified the standard for motions to dismiss brought under Fed. R. Civ. P. 12(b)(6) in *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007) (abrogating *Conley v. Gibson*, 355 U.S. 41 (1957)).

The *Twombly* Court expressly rejected the "no set of facts" standard previously relied upon by many federal courts, holding that "[a]fter puzzling the profession for 50 years, [the 'no set of facts' standard] has earned its retirement" and is "best forgotten." *Id.* at 1969. The Court held that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a *formulaic recitation of the elements of a cause of action will not do*. Factual allegations must be enough to raise a right to relief *beyond a speculative level*." *Id.* at 1964-1965 (internal quotations, alterations, and citations omitted). Rather, *Twombly* requires that a plaintiff allege "enough facts to state a claim to relief that is plausible on its face." *Id.* at 1974. Something beyond "the mere possibility" of a claim must be alleged "lest a plaintiff with 'a largely groundless claim' be allowed to 'take up time of a number of other people, with the right to do so representing an *in terrorem* increment of the settlement value." *Id.* at 1966.

The Complaint here fails to satisfy the *Twombly* standard with regard to any substantive count asserted and, as such, the Complaint should be dismissed. Specifically, Plaintiff fails to state a claim against WCI's with respect to Plaintiff's transaction with Resort, a transaction in which WCI did not participate.

### III.   ARGUMENT

#### A.   WCI Is Not Liable For The Acts Of Resort

Plaintiff alleges that various aspects of its transaction with Resort were deceptive and misleading in violation of both ILSA and FDUTPA. Plaintiff also alleges, without factual support, the mere conclusion that during the transaction, Resort was acting as the "agent or alter ego" of WCI. Pursuant to these unsupported allegations, Plaintiff seeks to hold WCI liable for the alleged violations of ILSA committed by Resort, and also seeks to impose liability on WCI

for these exact same acts under FDUTPA. However, there is no basis for holding WCI liable for the transaction entered into by Resort.

Resort is a subsidiary for WCI. Each is a separate and distinct corporate entity. "It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiary." *United States v. Bestfoods,* 524 U.S. 51, 61 (1998) (internal quotation marks omitted). The reason for this is that a parent and subsidiary are distinct legal entities and are entitled to be treated as such for purposes of liability. *Id.*; *see also Molenda v. Hoechst Celanese Corp.*, 60 F.Supp.2d 1294, 1300 (S.D. Fla. 1999) (stating that "the well-settled rule is that a corporation is a separate legal entity and, thus, that separate corporate form cannot be disregarded"). Due to the importance of this principle, courts hold parent companies liable for the acts of their subsidiaries only under very limited circumstances. *Molenda*, 60 F. Supp. 2d at 1300 ("In Florida, a corporate veil will be pierced only in exceptional circumstances, such as for fraud or where the corporation is formed for some illegal purpose."). *Eclipse Medical, Inc. v. American Hydro-Surgical Instruments, Inc.*, 262 F.Supp.2d 1334, 1359 (S.D. Fla. 1999) (stating that "a parent corporation will not be held liable for the actions of its subsidiary unless the subsidiary is deemed to be a mere instrumentality of the parent") (quoting *Federated Title Insurers, Inc. v. Ward,* 538 So.2d 890, 891 (Fla. 4th DCA 1989)).

To justify a departure from the well-established rule that distinct business entities should be treated separately, Plaintiff must do more than simply allege that a subsidiary is a "mere instrumentality," "agent," or "alter ego" of a parent. *See e.g. Spanish Broadcasting System, Inc. v. Clear Channel Communications, Inc.*, 242 F.Supp.2d 1350, 1363 (S.D. Fla. 2003) (dismissing complaint where plaintiff did not allege that the subsidiary "was a sham or mere instrumentality

12142980.1

5

for [the parent] to engage in illegal or improper activities"); *Maung Ng We & Massive Atlantic Ltd. v. Merrill Lynch & Co., Inc.*, No. 99 Civ. 9687 (CSH), 2000 WL 1159835, *9-10 (S.D.N.Y. Aug. 15, 2000) (dismissing complaint where there were no facts alleged to establish that subsidiary was acting on account of the parent); *Jean Anderson Hierarchy of Agents v. Allstate Life Ins. Co.*, 2 F. Supp. 2d 688, (E.D. Pa. 1998) (dismissing complaint where no facts were alleged to suggest parent corporation was alter ego and thus liable); *Warburton v. Foxtons, Inc.*, No. Civ. A. 04-2474(FLW), 2005 WL 1398512, *8 (D.N.J. June 13, 2005) (dismissing complaint where there were no allegations supporting an alter ego theory that parent had abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice).

Similarly, mere allegations that the parent and subsidiary have directors in common are insufficient to sustain a plaintiff's burden on a motion to dismiss since "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary." *Bestfoods*, 524 U.S. at 61. The reason for this rule is that "directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." *Id.* Thus, a plaintiff must do more than merely allege that a parent and subsidiary have directors in common to survive a motion to dismiss. *Akzona Inc. v. E.I. Du Pont De Nemours & Co.*, 607 F.Supp. 227, 240 (D.C. Del. 1984) (granting motion to dismiss for lack of personal jurisdiction over parent company in spite of allegations of common directors); *cf. Meterlogic, Inc. v. Copier Solutions, Inc.*, 126 F. Supp. 2d 1346, 1358 (S.D. Fla. 2000) (stating that "the sharing of a business address and the overlap of officers is insufficient to support a finding that the subsidiaries are the alter ego of their corporate parents"); *Greene v. Long Island R. Co.*, 280 F.3d 224 (2d Cir. 2002); *Pearson v. Component Technology Corp.*, 247 F.3d 471 (3d Cir. 2001).

Here, Plaintiff's bare allegations that Resort "was the agent or alter ego of WCI" and that "Resort and WCI share three common members (six member boards) of the respective board of directors," (Compl. ¶¶ 6-7), are insufficient as a matter of law to justify holding WCI responsible for Resort's actions. The Complaint must therefore be dismissed as to WCI.

### B.     Plaintiff Fails To State A Claim Against WCI Arising From WCI's Own Conduct

To the extent Plaintiff seeks to hold WCI liable for its own acts, as opposed to the acts of Resort, the Complaint also must be dismissed as to WCI.

#### 1.     WCI Is Not The Developer And Therefore Is Not Liable Under ILSA

The underlying purpose of ILSA is to ensure that a buyer, prior to purchasing certain kinds of real estate, is informed of facts which will enable him or her to make an informed decision about purchasing the property. The Act is designed to protect "purchasers" from abuse by real estate "developers" or their "agents." *Paniaguas v. Aldon Cos., Inc.*, No. 2:04-CV-468-PRC, 2005 WL 1983859, at *4 (N.D. Ind. Aug. 17, 2005); *Gibbes v. Rose Hill Plantation Dev. Co.*, 794 F.Supp. 1327, 1333 (D.S.C. 1992). Therefore, to qualify for protection under ILSA, a plaintiff must show that he or she purchased a lot from a defendant who qualifies as a developer or developer's agent. *Id.*

ILSA defines a "developer" as "any person who, directly or indirectly, sells or leases, or offers to sell or lease, or advertises for sale or lease any lots in a subdivision." 15 U.S.C. 1701(5). Under section 1701(6), "agent" means "any person who represents, or acts for or on behalf of, a developer in selling or leasing, or offering to sell or lease, any lot or lots in a subdivision; but shall not include an attorney at law whose representation of another person consists solely of rendering legal services."

These statutory definitions limit ILSA causes of action to entities that are involved in the sales process of the lot at issue. *Bartholomew v. Northampton Nat. Bank of Easton, Easton, Pa.*, 584 F.2d 1288, 1293 (3d Cir. 1978) (stating that "logically the statute should be interpreted to include within its scope only those engaged in the selling effort"); *Adema v. Great Northern Development Co.*, 374 F.Supp. 318 (N.D. Ga. 1973) (holding that lender that "never supervised or engaged directly or indirectly, in any advertising, development or sales activities" in the subdivision and did not make any representations, accurate or otherwise, to plaintiff was not a developer). Therefore, an entity that has no involvement in a plaintiff's sale must be dismissed from a complaint alleging violations of ILSA. *Paniaguas*, 2005 WL 1983859 at *5 (dismissing complaint as to entity where the complaint alleged that the plaintiff's purchased the lots in question from a different company, the plaintiffs dealt only with that other company, and there was no involvement by the entity in the transaction).

Here, Plaintiff does not, and cannot, allege that WCI was involved in the sales process by which Plaintiff bought the condominium at issue. Plaintiff implicitly acknowledges that there is no basis for holding WCI liable as a "developer" for Resort's transaction with Plaintiff by awkwardly alleging that "[d]efendant(s) is(are) a developer." Compl. ¶ 22. All of the allegations in the Complaint concerning WCI's involvement in Plaintiff's transaction refer to "Resort/WCI" and are therefore based on Plaintiff's theory that Resort is the "agent and alter ego" of WCI, not on any conduct actually engaged in by WCI. In addition, it is plain on the face of the contract attached as Exhibit A to the Complaint that WCI was not a party to Plaintiff's transaction. The Complaint is devoid of any allegations that WCI itself ever had any contact with Plaintiff, or participated in any way in the sale of Plaintiff's condominium. Therefore, WCI is not a "developer" as defined under ILSA, and the ILSA cause of action must be dismissed as to WCI.

### 2.      Plaintiff's FDUTPA Claim Against WCI Must Be Dismissed

#### a.      This Court Lacks Jurisdiction Over Plaintiff's FDUTPA Claim

Because Plaintiff fails to state a cause of action against WCI under ILSA, there is no jurisdictional basis for this Court to consider Plaintiff's FDUTPA claim against WCI. Although Plaintiff does not specifically state the jurisdictional basis for its FDUPTA claim, it appears that Plaintiff relies on the concept of supplemental jurisdiction in 28 U.S.C. § 1367. Section 1367(a) states:

> [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

When a federal court dismisses the claims on which its original jurisdiction are based, the court must decline to exercise supplemental jurisdiction over state law claims. *Barcena v. Dept. of Off-Street Parking of City of Miami*, 492 F.Supp.2d 1343, 1358 (S.D. Fla. 2007).

Here, Plaintiff asserts that the basis for this Court's original jurisdiction is 28 U.S.C. § 1331 since it is asserting a claim pursuant to ILSA, a federal statute. However, because Plaintiff's ILSA claims against WCI fail as a matter of law, this Court lacks supplemental jurisdiction over Plaintiff's FDUTPA claim against WCI.

To the extent this Court considers Plaintiff's FDUTPA claim, however, it is governed by Florida state law. *McDowell v. Brown*, 392 F.3d 1283, 1294 (11th Cir. 2004) ("Because the district court exercised supplemental jurisdiction over these claims when it was removed from state court, state law governs substantive issues and federal law governs procedural issues.").

12142980.1

9

### b. Plaintiff Was Not Aggrieved By Any Statements In the Contract

FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." § 501.204(1), Fla. Stat. The stated purpose of FDUTPA is to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2), Fla. Stat. (2007). Deception "occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." *Merrill Lynch Business Financial Services, Inc. v. Performance Machine Systems U.S.A., Inc.*, No. 04-60861-CIVMARTINEZ, 2005 WL 975773, *8 (S.D. Fla. 2005). A practice is "unfair" when it offends established public policy and when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. *Id.*

To state a cause of action under FDUTPA, a consumer must allege sufficient facts to show he was actually aggrieved by an unfair or deceptive act committed by the seller in the course of trade or commerce. *Merrill Lynch Business Financial Services, Inc. v. Performance Machine Systems U.S.A., Inc.*, No. 04-60861-CIVMARTINEZ, 2005 WL 975773, *8 (S.D. Fla. Mar. 4, 2005). A plaintiff must do more than merely allege in a conclusory fashion that a defendant's actions constituted an "unfair or deceptive act" or that the defendant acted "wrongfully, unreasonably and unjustly" and for a "deceptive and improper purpose." *Merrill Lynch Business Financial Services, Inc.*, 2005 WL 975773, at *8. In other words, a plaintiff must specifically allege *why* the defendant's conduct was unfair or deceptive and *why* he was aggrieved by that conduct.

      i.  **Plaintiff Fails To Allege Why The Estimated Date Of Completion Is Misleading**

Plaintiff alleges that the inclusion of an estimated completion date for the condominium is "illusory" and "substantially injurious to consumers." However, Plaintiff offers nothing more than conclusory allegations and fails to allege why an estimated completion date, fully described within the contract between the parties, is misleading. The contract specifically addresses the parties' understanding of the completion date for the Unit and specifically indicates that such completion date might be modified:

> D. The estimated date of completing, construction, finishing and equipping the unit and common elements of the Condominium is December 15, 2005. This date is only an estimate and may be effected by weather, acts of God, availability of materials and other factors known and not yet known.

Thus, the contract language itself makes it clear that the estimated date of completion may change, and Plaintiff's conclusory allegations are insufficient to establish that this contract term is deceptive. *Merrill Lynch Business Financial Services, Inc.*, 2005 WL 975773, at *8 (dismissing claim where plaintiff merely alleged that conduct was wrongful, unjust or unreasonable); *D.O.P. Investments, Inc. v. Oakland Hills Joint Venture*, 909 So. 2d 355, 356 (Fla. 4th DCA 2005) ("[a] party may not recover for fraud for an alleged false statement when proper disclosure of the truth is revealed in a written agreement between the parties").

      ii.  **Plaintiff Fails To Allege Why The Contract Is Misleading**

Plaintiff's FDUTPA claims against WCI are primarily based on the allegation that WCI drafted the contract that was used in Plaintiff's transaction.[1] As set forth previously, WCI is not

---

[1] Plaintiff also alleges that "WCI's violations of ILSA are *per se* violations of" FDUTPA. As stated above, however, WCI 1) is not liable for Resort's alleged conduct that violated ILSA, and 2) is not a "developer" and is therefore not liable under ILSA on any theory. Therefore, there are no "violations of ILSA" that could possibly form the basis of a *per se* FDUTPA claim against WCI.

12142980.1            11

a party to this Contract. Nonetheless, Plaintiff alleges that the statement included in Exhibit C to the contract that Resort's affiliate title insurance company charges the "minimum rate promulgated by the Florida Department of Insurance" is misleading in violation of FDUTPA and 15 U.S.C. 45(a) against WCI. Specifically, Plaintiff alleges that it was "mislead by the written contract into believing that the rate charged by [Defendant's] affiliated business is the bare minimum available charge as allowed by Department of Insurance." Compl. ¶ 46. However, the statement that Resort's affiliate First Fidelity Title ("FFT") charges "minimum rate promulgated by the Florida Department of Insurance" is not untrue, nor did Resort omit any facts regarding title insurance rates necessary to make its disclosure concerning title insurance rates not misleading.

The Florida Financial Services Commission (the "Commission") sets the specific rates to be charged for title insurance, including the amount to be retained by the insurer and agent. § 627.782(1), Fla. Stat. (2007) (the Commission "must adopt a rule specifying the premium to be charged in this state by title insurers for the respective types of title insurance contracts and, for policies issued through agents or agencies, the percentage of such premium required to be retained by the title insurer which shall not be less than 30 percent"). It is illegal for any title agent to charge an amount different than those set in the rate schedule promulgated by the Commission. Fla. Stat. 627.78(1) (stating that "[a] person may not knowingly quote, charge, accept, collect, or receive a premium for title insurance other than the premium adopted by the commission").

The rates adopted by the Commission are listed in Florida Administrative Code Rule 69O-186.003, which provides that the premium charged for an original owner's title insurance policy "shall be:"[2]

|  | Per Thousand [of Insurance][3] | Minimum Insurer Retention |
|---|---|---|
| From $0 to $100,000 of liability written | $5.75 | 30% |
| From $100,000 to $1 million, add | $5.00 | 30% |
| Over $1 million to and up to $5 million, add | $2.50 | 35% |
| Over $5 million and up to $10 million, add | $2.25 | 40% |
| Over $10 million, add | $2.00 | 40% |

Rule 69O-186.003(1)(a)(1) also specifies certain minimum premiums to be charged:

> b. The <u>minimum premium</u> for all conveyances except multiple conveyances shall be $100.
>
> c. The <u>minimum premium</u> for multiple conveyances on the same property shall be $60.
>
> 2. In all cases the owner's policy shall be issued for the full insurable value of the premises.

(emphasis supplied).

Although Plaintiff claims that it was mislead because it could have paid less for title insurance if it had received a rebate, Plaintiff expressly acknowledges that a rebate is not actually a part of the rates promulgated by the Department: "[a] prospective purchaser could have obtained a rate <u>less than the amount promulgated by the Florida Department of Insurance</u> with a

---

[2] The contract attached to the complaint makes it clear that owners' title insurance policy is at issue.

[3] The Rule specifies that "[t]o compute any insurance premium on a fractional thousand of insurance (except as to minimum premiums), multiply such fractional thousand by the rate per thousand applicable, considering any fraction of $100.00 as a full $100.00."

title company not affiliated with [Defendants] by receiving a rebate of the title agent's portion of the risk premium." Compl. ¶ 32.

The Florida Supreme Court's decision in *Chicago Title Insurance Co. v. Butler*, 770 So. 2d 1210 (Fla. 2006), supports the conclusion that the rebate referred to by Plaintiff is not part of the "minimum rate" set forth in Rule 69O-186.003. In *Butler*, the Florida Supreme Court declared unconstitutional certain portions of the Insurance Code which prohibited title insurance agents from rebating any portion of the premium rates they received to repeat customers. Thus, the Court held that once the rates set by the Commission are properly charged, an agent is free to attempt to negotiate to have its portion of that rate—which is set by rule at seventy percent of the premium charged—returned by rebate. Such a rebate is not a "rate" specifically set by any statutory or regulatory authority, and a title insurance agent is not obligated to offer a rebate.

Moreover, there was no material omission concerning title insurance rates. As a preliminary matter, there is no general duty to disclose the lowest possible prices for title insurance, especially in this type of an arms-length transaction where Defendant is not even an insurance company. *See Oden v. First Floridian Auto & Home Ins. Co.*, No. 02-CA-3244-JT, slip op. at 2 (Fla. Cir. Ct. Dec. 5, 2003) (finding "there is no duty to disclose to Plaintiff or other customers the lowest available prices for automobile insurance, therefore, this Court should dismiss [the] action"); *see also Griggs v. The Progressive Corp.*, No. CI 2003-200, slip. op. at 3 (Miss. Cir. Ct. May 18, 2004) ("Therefore, to the extent [p]laintiff's fraud claim is based upon a mere concealment or nondisclosure of the lowest price [for insurance] by the Progressive defendants, Plaintiff has failed to state a claim upon which relief can be granted"); *Smith v. The Progressive Corp.*, No. 2003-0078, slip. op. at 3 (Miss. Cir. Ct. May 14, 2004) (holding that because "no fiduciary duty exists between a seller of insurance and a purchaser . . . there was no

affirmative duty on the part of the Defendants to disclose to the Plaintiff that she was not receiving the lowest quote").

The contract specifically discloses that better title insurance prices might be available from non-affiliated entities:

> You are NOT required to use the listed provider(s) as a condition for the purchase, sale or refinance of the subject property. THERE ARE FREQUENTLY OTHER SETTLEMENT SERVICE PROVIDERS AVALIABLE WITH SIMILAR SERVICES. YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THESE SERVICES.

This provision makes clear that Plaintiff was made aware of the possibility that better prices were available and also that Plaintiff bore the burden of investigating the availability of lower prices for title insurance, including the availability of rebates. *Zlotnick v. Premier Sales Group, Inc.*, 431 F. Supp. 2d 1290, 1295 (S.D. Fla. 2006) (no FDUTPA claim where the express terms of the contract refuted claim that purchaser was misled); *cf. Fillmore v. Dept. of Pub. Utils.*, 257 N.E.2d 427, 428 (Mass. 1970) ("It is not unreasonable to place the burden on the customer to see that he is getting the lowest rate to which he is entitled.").

Plaintiff also alleges that WCI violated section 45(a) by making a false representation as to the price of goods. Plaintiff further alleges that a "misleading representation of price constitutes a violation of 15 USC §45, even if offered price presents actual value of product and purchaser is receiving their money's worth" [sic]. Plaintiff is apparently referring to, and mis-characterizing, the following well-established rule:

> It has long been considered a deceptive practice to state falsely that a product ordinarily sells for an inflated price but that it is being offered at a special reduced price, even if the offered price represents the actual value of the product and the purchaser is receiving his money's worth.

12142980.1                                15

*F.T.C. v. Colgate-Palmolive Co.*, 380 U.S. 374, 387 (1965). In this quote, the United States Supreme Court makes it clear that the statute prohibits a false mark-up, even if the purchaser still receives the actual value of what he is purchasing. Here, there are simply no allegations of a mark-up. Plaintiff's FDUTPA claim against WCI must therefore be dismissed.

### c.  WCI Is Not Liable For The Estimated Budget

Plaintiff also alleges that "WCI's inclusion of an erroneous budget in its pre-closing notice" is a violation of FDUTPA. However, the allegation that it was *WCI* that included any budget received by Plaintiff is refuted by 1) Plaintiff's allegations paragraph 46 of the Complaint, which states that "Resort/WCI included an updated estimate" budget and is clearly based on Plaintiff's theory that Resort was operating as an agent or alter-ego of WCI, which fails as a matter of law; and 2) the documents attached to the Complaint by Plaintiff, which indicate that Plaintiff's transaction was with Resort only. *Cf. Crystal v. Foy*, 562 F.Supp. 422 (S.D.N.Y.1983) (dismissing complaint upon examining sources cited by plaintiff as containing misrepresentations and finding that "[p]laintiff's own source repels her claim ...").

### C.  The Contract Cannot Be Declared Void

As a general rule, "parties are free to 'contract-out' or 'contract around' state or federal law with regard to an insurance contract, so long as there is nothing void as to public policy or statutory law about such a contract." *Green v. Life & Health of America*, 704 So.2d 1386, 1390 (Fla. 1998). The reason for this rule is that contracting parties may not "stipulate for iniquity" and public welfare dictates that "each contract must have a lawful purpose." *Wechsler v. Novak*, 26 So.2d 884, 887 (Fla. 1946).

Public welfare does not demand that every contract that may run afoul of a particular statute is entirely void. Rather, "a contract in violation of a statute, which statute does not

expressly declare such contract void, will be enforced unless there is some other indication within the statute of legislative intent to invalidate such contract." *Talco Capital Corp. v. Canaveral International Corp.*, 225 F.Supp. 1007 (S.D. Fla. 1965), *aff'd* 344 F.2d 962 (5th Cir. 1965); *see also Palm Bay tower Corp. v. Brooks*, 466 So. 2d 1071 (Fla. 3d DCA 1985). Therefore, a court will not declare a contract void where there is no indication, either in the statute itself or in its legislative history, that the remedy for a violation of that statute is to void contracts. *Trotter v. Ford Motor Credit Corp.*, 868 So. 2d 593, 594 (Fla. 2d DCA 2004).

In *Trotter*, 868 So. 2d at 594, a car purchaser sued the dealer who sold him the car and the assignee of his financing contract, alleging that he was entitled to restitution of the amount he paid under the financing contract. In support of his restitution claim, the purchaser asserted that the financing contract was void under Florida's public policy because it violated several statutes. *Id.* The Second District Court of Appeal held that the purchaser failed to state a claim for restitution. *Id.* The court reasoned that "[n]othing in the language of the Motor Vehicle Retail Sales Finance Act, or in Florida case law, would render the entire finance contract void because of the violation of chapter 520." *Id.* The court pointed out that the plaintiffs could not "circumvent their inability to state a cause of action against [the assignee of the financing contract] merely by claiming any violation renders the contract void." *Id.*

Here, Plaintiff claims that it has been damaged by WCI's failure to return its deposit because the contract was "void *ab initio*, as it was illegal under ILSA and FDUTPA." Nothing in ILSA, or its legislative history, or case law, indicates that the Congress intended that all contracts that violate ILSA are void. Rather, ILSA provides very strict time limits on seeking a remedy of rescission. Specifically, claims for rescission must be made within two years of the execution of the sales contract. *See e.g.* 15 U.S.C. § 1703(c), (d). This demonstrates a

legislative intent to limit the remedy of declaring a contract void in violation of ILSA to two years from the time the purchase contract was signed. Plaintiff filed this action more than two years after signing his contract with Resort and has not alleged that he timely asserted any right of revocation under ILSA. Therefore, any alleged failure to comply with ILSA cannot render the entire contract void, and Plaintiff is not entitled to the relief he seeks.

## CONCLUSION

WHEREFORE, WCI respectfully requests that the Court dismiss the Complaint with prejudice and grant such other and further relief as the Court deems appropriate.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 11, 2007, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

        CARLTON FIELDS, P.A.
        222 Lakeview Ave., Suite 1400
        West Palm Beach, FL 33402-0150
        (561) 659-7070 Telephone
        (561) 659-7368 Facsimile
        E-mail: jianno@carltonfields.com

        By: /s/ Joseph Ianno, Jr.
            Joseph Ianno, Jr.
            Florida Bar No. 655351
            Kathryn Christian
            Florida Bar No. 27594

        Attorneys for WCI Communities, Inc. and Resort at Singer Island Properties, Inc.

## SERVICE LIST

James D. Ryan, Esq.
jdr@attyryans.com
Ryan & Ryan Attorneys, P.A.
631 U.S. Highway One, Suite 100
North Palm Beach, FL 33408
Telephone: (561) 841-3420
Fax: (561) 841-3424
Attorney for Plaintiff Infinity Global LLC

Timothy P. O'Neill, Esq.
tpo@attyryans.com
Ryan & Ryan Attorneys, P.A.
631 U.S. Highway One, Suite 100
North Palm Beach, FL 33408
Telephone: (561) 841-3420
Fax: (561) 841-3424
Attorney for Plaintiff Infinity Global LLC